Kenneth Reiner and Alice Reiner v. Commissioner. Frank A. Klaus and Margaret Klaus v. Commissioner
Reiner v. Commissioner
Docket Nos. 94943, 94962.
United States Tax Court
T.C. Memo 1965-197; 1965 Tax Ct. Memo LEXIS 134; 24 T.C.M. (CCH) 1005; T.C.M. (RIA) 65197; July 20, 1965
*134 Construction activities on a personal residence held, on the facts, to constitute, in part, research and experimental expenditures within the meaning of section 174, I.R.C. 1954. Arthur Groman, Hilbert P. Zarky, and Myron E. Harpole, 6399 Wilshire Blvd., Los Angeles, Calif., for the petitioners. Thomas F. Greaves, for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: In these consolidated proceedings, respondent determined deficiencies in income tax for 1958 and 1959 of $21,377.51 and $29,502.84 against petitioners Reiner and $20,982.14 and $34,950.67 against petitioners Klaus, respectively. These deficiencies arise mainly from respondent's disallowance of certain deductions, claimed as research and development *136 expenses and depreciation allowances with regard to an experimental project, which increased the petitioners' distributive share of partnership taxable income for the years in question. By amended petitions filed in both dockets, petitioners raise an alternative contention of an abandonment loss. Since several other issues have been settled by stipulation of the parties, conceded or abandoned, decisions in these cases will be entered under Rule 50. The issues remaining for our decision are: 1. Whether respondent properly disallowed certain research and experimental expense and depreciation deductions claimed by petitioners' partnership, The Kaynar Company, in its fiscal years ending March 31, 1958 and 1959, and properly increased petitioners' distributive shares of partnership income in the calendar years 1958 and 1959 as a result of such disallowance; and 2. Alternatively, whether petitioners' partnership, The Kaynar Company, suffered a deductible loss in the amount of $47,000, due to the abandonment of a pre-stressed concrete business, during its fiscal year ending March 31, 1959. Findings of Fact Some of the facts have been stipulated and the stipulation of facts, together *137 with the exhibits attached thereto, are incorporated herein by this reference. During the calendar years here in issue, petitioner Kenneth Reiner (hereinafter sometimes referred to as Reiner) and Alice Reiner were husband and wife, and petitioner Frank A. Klaus (hereinafter sometimes referred to as Klaus) and Margaret Klaus were husband and wife, all residing in Los Angeles, California. They filed joint individual income tax returns for the calendar years 1958 and 1959, on the cash basis method of accounting, with the district director of internal revenue, Los Angeles, California. Alice Reiner and Margaret Klaus are petitioners herein only by virtue of having filed joint returns with their husbands. Reiner and Klaus, collectively, will sometimes hereinafter also be referred to as petitioners. Reiner and Klaus first met while they were students at Purdue University during the mid-1930's. Reiner graduated from Purdue University in 1937 with a bachelor of science degree in engineering and thereafter he and Klaus came to California. During 1937-1938 they attempted unsuccessfully to go into the candy business. Reiner sold typewriters for L. C. Smith and Company in 1939, and worked *138 for the Holophane Company in New York City in 1940. In 1941 he returned to California and for a year and one-half thereafter worked as an engineer-trainee for Lockheed Aircraft Company. Reiner subsequently worked for a few months for Hughes Aircraft Company. Beginning in 1943, he and Klaus formed a partnership, which became known as The Kaynar Company (hereinafter sometimes referred to as Kaynar), for the purpose of engaging in the manufacture of nut and bolt retainers for use in aircraft as blind fasteners. Reiner and Klaus commenced the conduct of their business in 1943 as the sole and equal partners of Kaynar under an oral agreement of partnership expressed in general terms. They continued the operations of Kaynar without modification of the oral agreement until they liquidated and dissolved Kaynar on or about August 6, 1961, except that on February 28, 1958, Reiner and Klaus executed a written agreement which was subsequently modified in certain respects by further written agreements dated May 31, 1960, and January 20, 1961. In order "to facilitate the expansion of the manufacturing activities of the company," on August 16, 1948, Reiner and Klaus caused the articles of incorporation *139 of Kaynar Manufacturing Company, Inc. (hereinafter sometimes referred to as Kaynar, Inc.) to be filled with the secretary of state of the State of California. Thereafter, on August 26, 1948, they filed an application with the commissioner of corporations for the State of California for a permit to sell and issue shares of capital stock of Kaynar, Inc.
Pursuant to the above-said application, on or about September 1, 1948, Kaynar, Inc., issued 400 shares of no par capital stock to Kaynar in exchange for the manufacturing business assets of Kaynar, viz., land, building, machinery, equipment, furniture, fixtures, cash, accounts receivable and inventory, with no sum being allocated to goodwill. Subsequently, Kaynar engaged in the business of selling the products manufactured by Kaynar, Inc. On or about March 25, 1957, Kaynar transferred the 400 shares of Kaynar, Inc., stock to petitioners in equal amounts of 200 shares. Sometime prior to November 21, 1944, Klaus developed "Nut and bolt socket fastenings" which were the subject of a United States patent issued on the aforesaid date to Klaus as inventor. After the partnership had been in business for about a year and one-half, its business *140 of manufacturing nut and bolt retainers were adversely affected by the cessation of World War II. Searching for new sources of business for the partnership, sometime between April of 1945 and January 18, 1949, Reiner and one Armand Braga (hereinafter sometimes referred to as Braga), under Reiner's direction, developed a novel type of woman's pin curl clip made out of spring steel. On January 18, 1949, a United States patent was issued to Reiner and Braga as co-inventors of a pin curl clip. The clip became known as the "Lady Ellen Pin Curl Clip." Reiner continued to develop this device and, commencing on July 9, 1957, through October 8, 1963, four United States patents and three United States design patents relative to pin curl clips were issued to Reiner as inventor. Kaynar achieved great financial success with these pin curl clips and similar devices. It and, subsequently, Kaynar, Inc., became the largest producer in the world of pin curl clips, with sales of such clips numbering in the billions. On May 9, 1957, Kaynar sold the Lady Ellen clip patent to Kaynar, Inc., for a consideration of $950,000, payable in installments. The Commissioner of Internal Revenue issued a letter ruling *141 to the effect that the gain on the sale qualified as capital gain. When the Korean hostilities commenced in July 1950, with an accompanying increase in production of military and aircraft equipment, Reiner and Klaus decided to reactivate the nut and bolt retainer business of Kaynar. In connection therewith, and concerned about obtaining an adequate supply of self-locking nuts as an insert for Kaynar's nut channels and retainers, Reiner conceived and designed a lightweight, self-locking nut, on which a United States patent was issued to him as inventor. The device, which became known as the "Kaylock," was unique and made an important contribution to the aircraft industry, particularly with respect to achieving weight reduction in air frames. The Federal Government, thereafter, drew specifications of such a nature that only the Kaylock type of nut could be used to fulfill these requirements, and other companies were eventually compelled to take licenses. Reiner continued to improve the locknut and various domestic and foreign patents relating to the locknut business were obtained by him. Reiner also worked on devising machinery for manufacturing these products. The locknut became a *142 commercial success and at the end of 1956, Kaynar's gross sales of locknuts were approximately $4,500,000 per year. Generally, Reiner was in charge of manufacturing operations and the technical side of the business and Klaus was in charge of administrative and sales functions. By the close of 1956, the combined sales of Kaynar and Kaynar, Inc., were approximately $6,000,000 per year with profits of about $500,000 to $600,000 per year after taxes. The success of the business resulted from the joint efforts of Reiner and Klaus. In 1956, Kaynar, Inc., was engaged in having a new factory building constructed. Construction was begun by a building contractor, but several months later his services were terminated and Kaynar, Inc., assumed the task of completing the building. Reiner personally took charge of the project. Reiner had become interested in the use of pre-stressed concrete (i.e., concrete in which the reinforcing steel is under tension at all times, and in which the concrete is under compression at all times), a technique of using concrete which permits the use of longer, unsupported spans. Reiner hired and took over supervision of the pre-stressed concrete crew and foreman *143 of the contractor who had started the job, and he successfully made pre-stressed concrete beams for the factory building. The design of the building was under the supervision of T. Y. Lin & Associates, authorities on pre-stressing. John Lautner (hereinafter sometimes referred to as Lautner), an architect, had charge of the design of the offices and later, the factory as well. It was unusual in the Los Angeles area, in 1957, to find a pre-stressed concrete roof on a commercial type of building, and Kaynar, Inc., was one of the first to use such a roof in the area. The construction was unusual in that the pre-stressing was done in two directions, and it attracted the attention of contractors and builders in the city of Los Angeles. Reiner spent a substantial amount of time at the building site learning about pre-stressed concrete. The construction of the Kaynar, Inc., factory building was completed either late in 1957 or early in 1958 and the construction costs were paid by Kaynar, Inc.Kaynar performed no work in connection with the construction of Kaynar, Inc.'s factory building. The only construction work Kaynar, Inc., ever engaged in was in connection with the construction of its *144 own factory building. From the time of their marriage, the Reiners had been living in a home in the Silverlake area of Los Angeles. The house became inadequate due to the needs of their small children, and they looked for a new location. In September and October of 1954, Reiner purchased five contiguous lots in the Silverlake area, close to his then residence. He subsequently purchased two more lots contiguous with the first five, one of these in August of 1956 and the other in February of 1959. The first six lots acquired were purchased at a total cost of $26,000. In the early part of 1956 Reiner consulted with Lautner relative to commissioning Lautner to design a personal residence on the originally acquired five lots. Lautner received his training as an architect under Frank Lloyd Wright during the period 1933 through part of 1939 and subsequently designed a number of "one-of-a-kind" homes. On March 30, 1956, Reiner and Lautner entered into a written contract relative to the architectural services to be performed by Lautner on Reiner's new home. In April of 1956, Lautner estimated the cost of constructing the residence to be $55,089. In August of 1956 Reiner purchased his *145 sixth lot and Lautner's plans were enlarged to include a guest house (the "roundhouse") which would serve as a residence for his parents and would contain an elevator. Lautner's estimate of the total cost of construction subsequent to this change was $80,000, upon which he was to receive an architect's fee of 10 percent of cost. Subsequently, and while still planning a personal residence, the plans were changed to include a curved driveway from the street in front of the house, up the sharp rise on which the house was to be built, which was to be supported partially by the roundhouse and exiting onto the street behind the proposed residence. The improved real property which these consolidated cases concern is located at 2138 Micheltorena Street, Los Angeles, California. The property is commonly known as "Silvertop" and will hereinafter sometimes be referred to as such. The construction of the footings, foundations and ground layout of Silvertop commenced sometime in August or September of 1956 and followed the modified design drawn by Lautner after Reiner had purchased his sixth lot. The floor plan of Silvertop as it presently exists, except for the roundhouse, driveway ramp, swimming *146 pool, outside showers and tennis court, was that first reflected in Lautner's preliminary sketches drawn between February and March 30, 1956. These sketches served as the basis for the written agreement between Reiner and Lautner dated March 30, 1956, and are followed in Lautner's architectural design drawing dated May 11, 1956. Construction was started on Silvertop under an "Application to Construct New Building" filed with the Department of Building and Safety of the City of Los Angeles on September 14, 1956. The building application was filed by Lautner on behalf of Reiner and with Reiner's authorization. Among other information, the building application discloses that the building zone is "R-1" (for personal residences only), the purpose of the residence is "Dwelling & Carport & Accessory Living Quarters," the owner is Reiner and the certified architect is Lautner. Thereafter, and through February 2, 1959, 16 more building applications, of various nature, were filed with regard to Silvertop, all of which set forth Reiner as owner. Because of their interest in pre-stressed concrete and its commercial possibilities, and because they believed that the development of new products *147 for the building industry offered business opportunities for them, petitioners entered into an oral agreement, in December of 1956, to convert Silvertop into an experimental project of Kaynar. That agreement contemplated that the experimental project would have a duration of some two years and that within that period Kaynar would be able to diversify its business activities (which to that date were promotion, sales, and distribution of its pin curl clips and self-locking nuts and supervision of the activities of Kaynar, Inc.) by developing products for the building construction business. On the advice of petitioners' certified public accountant, Joseph H. Cohen (hereinafter sometimes referred to as Cohen), who believed that the accounting department should have certain written guidelines and directives, petitioners reduced their oral agreement relative to Silvertop to a written agreement dated February 28, 1958. Cohen was first engaged by Kaynar and Kaynar, Inc., in 1951. From that time to the date of trial Cohen has prepared the income tax returns of Kaynar and Kaynar, Inc., as well as the personal income tax returns of petitioners. The written agreement [1] was made with reference *148 to the "experimental residence" then under construction and states that Reiner has agreed to lease the real property, on which the experimental residence was being erected, to the partnership for an annual rental equal to the real estate taxes thereon. Upon the completion of the structure, Reiner agreed to purchase the residence "at a fair price which will be established by him," in which there would be evaluated such factors as square footage of living area, average construction costs of similar dwellings, resale value, prices of homes in the general area and any other pertinent factors. Under no circumstances was the price to be less than $15 a square foot of inside living area. Reiner personally agreed to bear any sums paid in connection with the residence in excess of $400,000. It provided, further, that: It is anticipated that during the course of this program, certain patentable ideas may be developed by Reiner or others working on the experimental residence project. At the time of the purchase of the experimental residence by Reiner, he will designate which of his patentable ideas, if any, are to be deemed the property of The Kaynar Company. All such ideas not so designated *149 shall remain Mr. Reiner's separate and exclusive property; all patentable ideas developed by others working on the experimental residence project shall belong to The Kaynar Company. Reiner shall reimburse The Kaynar Company in such amounts as he shall determine to be proper in accordance with the costs applying thereto for any of his patentable ideas retained by him. * * *
When Reiner announces the price at which he will purchase the experimental residence, Klaus shall have a period of thirty (30) days thereafter of accepting, on behalf of The Kaynar Company, the price announced by Reiner to be paid to The Kaynar Company for the experimental residence. If Klaus shall reject the price offered by Reiner, Reiner shall become indebted to The Kaynar Company in the amount of 80% of the total amount expended by The Kaynar Company in connection with the said experimental residence (which sum as provided herein shall not exceed $400,000.00) and Reiner shall thereupon become the owner of all patentable ideas, materials and products developed in connection with the said experimental residence and, as *150 against The Kaynar Company, shall be entitled to the exclusive use of the corps of personnel developed in connection with the said experimental residence and shall be the owner of all tools, dies, models and materials theretofore involved. In addition, Reiner shall be entitled to purchase from Klaus all of Klaus' stock in John Lautner Architect at Klaus' cost. In the event that prior to the statement by Reiner of the price at which he will acquire the experimental residence, Reiner and Klaus shall sell their interests in The Kaynar Company or Kaynar Mfg. Co., Inc. to some third party or parties, Reiner shall have the option of acquiring from The Kaynar Company the experimental residence and all matters connected therewith, as defined above, at the total cost incurred therefor by The Kaynar Company to the date of Reiner's exercise of such option. Reiner's option to elect to purchase the experimental residence in the event of a sale to a third party or parties as aforesaid shall remain open for a period of thirty (30) days commencing with the completion of the sale. On May 31, 1960, the written agreement was amended to provide that Kaynar would expend up to $600,000 on the experimental *151 residence, rather than $400,000 as set forth in the original written agreement. In the interim, petitioners, in order to secure the steady services of Lautner, caused to be formed on June 14, 1957, John Lautner Architect, a California corporation. All of the issued and outstanding stock of the corporation was owned equally by petitioners during the years in question. On or about April 8, 1957, a building application was filed with the Department of Building and Safety of the City of Los Angeles relative to the use of pre-stressed concrete block in the construction of the roundhouse at Silvertop. Thereafter, the Department of Building and Safety informed Reiner that it would not grant a permit for the proposed pre-stressed concrete block construction and advised him that if he wanted to press the matter further, appeal would have to be made to the Board of Building and Safety Commissioners of the City of Los Angeles. Reiner's appeal and a request for a rehearing were turned down by this board. However, he eventually succeeded after application to the Superior Court of the State of California in and for the County of Los Angeles. Subsequent to petitioners' decision to turn Silvertop *152 into an experimental project of Kaynar, two underground walk-through utility tunnels were constructed to provide access for the installation, maintenance and operation of the various fixtures which were contemplated. Two 400 ampere services were installed to supply electrical power to Silvertop (as compared with the 100 to 150 amperes in power utilized in the normal household installation). Changes in the original plans were also made to provide for the use of pre-stressed concrete in the roof over the living area, in the cantilevered ramp of the driveway (supported by the roundhouse), in the roundhouse (where pre-stressed concrete block was to be used) and in a tennis court (which was not in the original plans). The pre-stressed concrete roof over the living room area (which took the place of the wooden roof in Lautner's original design) posed problems relative to the character, decor and acoustics of the house which Reiner undertook to solve. The roof turned out to be thicker than anticipated, weighed approximately 167-176 tons, and gave rise to certain construction problems. The crew that had been working at the factory building of Kaynar, Inc., was used for the initial phases *153 of the pre-stressed concrete work at Silvertop. One of the first operations was the pouring of the slab for the tennis court. Shortly after, about July 20, 1957, a strike developed at the Kaynar, Inc., plant. A picket appeared at Silvertop, the men were ordered off the job by the union, and it became necessary to engage non-union help to work on the factory building as well as on Silvertop. The prestressed concrete work at Silvertop was finished only with great difficulty and cost and the use of outside contractors. The completion of the pre-stressed concrete work at Silvertop was the last effort made by Reiner and Kaynar in the pre-stressed concrete field. T. L. Stam (hereinafter sometimes referred to as Stam) joined Kaynar in the latter part of 1956 as its full-time house patent counsel. He had, among his functions, the responsibility for keeping records of all "patentable" inventions developed at Silvertop, conducting preliminary patent searches, and preparing preliminary and final patent applications for such inventions. Stam testified that because it became increasingly difficult for him to keep up with the developments at Silvertop, he hired an assistant in November of 1959 *154 whose duty was to visit Silvertop at least once a week to ascertain any developments, make drawings, and keep Stam informed of them. The assistant was employed until sometime early in 1961. Files were regularly kept for Silvertop items by Stam. There were 63 separate files from which 20 to 30 preliminary patent applications had been prepared. In addition, at the time of trial, ten applications for United States patents had been filed with respect to items not included in the above 63 files which were developed at Silvertop; two patents had been issued on these applications and the rest were still pending at the time of trial (October 29 through November 6, 1963). Some of these items are also the subject of foreign patents and patent applications. Kaynar also used patent counsel in Washington, D.C., to conduct pre-examination patent searches on Silvertop developments. Sometime in 1959, Reiner employed one Melvin Berkman to study and make an evaluation of the market potential of several items being developed at Silvertop. During this period, Reiner's wife complained about the length of time involved to complete the new residence. To relieve the pressure from his wife relative to the *155 completion of the residence, and to permit the continuation of the various projects at Silvertop, Reiner purchased, and occupied, another residence in the Silverlake area in July of 1958 for approximately $55,000. In the early part of 1959, Kaynar acquired from Braga (who had previously worked with Reiner in the development of the Lady Ellen hair clip) the Inox Company (hereinafter sometimes referred to as Inox) whose physical assets consisted principally of machine shop equipment that could be used in connection with the work at Silvertop. Inox then became a division of Kaynar, Braga resumed work for Kaynar, and the Inox facilities were moved to the vicinity of Silvertop. There were some five or six employees at Inox and a substantial amount of the work done there was in connection with the Silvertop project. Among the projects which were the subject of investigation at Silvertop were: 1. Wall panel clips, for which a United States patent application was filed on September 11, 1963. These panel clips were developed as a means of installing wood siding without the use of nails. 2. A motorized swing-out baseboard panel which permits clusters of electrical outlets to be concealed *156 but readily accessible. Kaynar's files showed that a preliminary patent application had been drawn and a preliminary patent search had been made. 3. Removable ceiling panels which involved an effort to develop a modular ceiling panel, which would be held in place by springs on rails in the ceiling so that the panels would be easily demountable to provide ready access, acoustical qualities, and an area for sound entrapment above the ceiling area. 4. A planetary door, which involved the development of a door that does not swing in the conventional manner, could be used in locations that are too small or narrow for doors hinged in the normal manner, and would constantly present a surface to the viewer that would match or fit in with the decor of adjacent rooms and would not slam. Work was done on several different versions of the planetary door in an effort to keep the door in a particular position, permit it to move automatically from one position to another, and produce less noise upon closing. 5. The use of glass as a building material. Efforts were made to utilize thin sheets of glass where thicker sheets of glass are conventionally used. Reiner believed that joining thin sheets *157 of glass in an inconspicuous manner, rather than using conventional framing materials, would constitute a significant advance in building techniques. The work included various aspects of a sliding glass door or window consisting of five ceiling-to-floor panels of thin glass, hung from the top and joined at the sides to one another by flexible connecting joints, the entire window being mechanically driven and traveling on a helical curve. 6. Windows which included such devices as a means of shading between two panes of glass which would permit varying intensities of shading; a mechanism for operating vertical louvered windows; windows with provisions for internal storage of louvers and a self-cleaning device; collapsible windows; louver actuating mechanisms; and a window actuator. 7. Lighting problems which included study of means of regulating light through skylights, such as folding ceiling panels and rotatable skylights. Also investigated were structural, rotating louvered beams, concealed lighting arrangements (which would also include the achievement of variations in light intensity, both by mechanical and by electrical means), and pivotable and retractable tennis court lights. *158 8. A tempered water system (which would maintain water at a constant temperature) and a temperature responsive regulator for such purposes; silent drains; toilet bowl-filling means from below; selfcleaning toilet bowls; remotely-controlled and self-shut-off water devices; bathtub temperature maintenance; solonoid-operated valves; nonfogging mirrors; childsafe medicine cabinets; self-draining soap dishes; and quiet toilet exhausts. 10. Helical-driven drapery rods (similar in concept to the drive for the sliding glass living room windows); a floating water drain designed to perform skimming functions in swimming pools; spirally-wrapped, collapsible tube structures; and a cycling silent motor. 11. A low-voltage switching and security system permitting remotely-controlled switching functions for electric lights, electrical appliances and electrical outlets under the trade name "Swepe." The system is arranged so that it also indicates whether or not a particular light or appliance is on. Some of the components of the Swepe system are the subject of patents and patent applications, both domestic and foreign. Swepe was the first development coming out of Silvertop to be exploited *159 commercially. Since 1961, a substantial amount of money has been invested in the further development of Swepe, and it is currently being manufactured and sold in southern California. The system can be installed for a cost of $100 to $125 in addition to the cost of a conventional electric system in a tract house and has been contracted for in hundreds of homes in southern California. Silvertop was used to demonstrate Swepe to the press, contractors and other interested persons. The construction of Silvertop had not been completed as of the time of the trial (October 29 through November 6, 1963). Invoices were kept for all materials purchased for Silvertop and records were kept of all wages paid for labor, the cost of other services performed at the project and of bills of contractors and subcontractors. At the beginning, all expenditures were paid by Kaynar and charged to Reiner's drawing account. This practice continued even after Silvertop became a project of Kaynar and continued until the close of the partnership fiscal year in 1958 (after the agreement of Reiner and Klaus was reduced to writing). At that time, Reiner's personal drawing account was credited with the entire amounts *160 previously expended and these expenditures were charged to the Silvertop project of Kaynar, which was kept as a separate account on the partnership's books. All subsequent expenditures for Silvertop were also entered on the partnership's books. The amount credited to Reiner's account as of February 28, 1958, was $211,467.94. Prior to March 31, 1957, the amount charged to Reiner's account was $37,266.89, consisting of labor, $15,806.70; material, $5,975.24; subcontractors and rentals, $6,660.21; professional services, $8,774.32; miscellaneous expenses, $50.42. The first payments made by the partnership and charged to Reiner's account took place in October of 1956. During the time the charges were being made to Reiner's account prior to February 28, 1958, a complete set of double entry books was kept, as was true subsequent to February 28, 1958, when Silvertop was being shown on the partnership books directly. Records were not kept, however, on the cost of the individual projects at Silvertop and no attempt at allocation was made, the books being kept on the basis of total annual expenditures. In Kaynar's partnership income tax return for the fiscal year ended March 31, 1958, there *161 was deducted as development expense, on account of the Silvertop project, the amount of $31,980.32. This amount represented 80 percent of the amounts expended for architectural and engineering fees. Petitioners considered that 20 percent of the expenditures at Silvertop were allocable to its residual value as a residence and thus were the nondeductible, nonamortizable, capital costs of the structure, while the remaining 80 percent was attributable to the research and development aspects of the project. A further $49,424.17 deduction was claimed for depreciation with respect to Silvertop. In determining the amount of the depreciation deduction, the accountant who prepared the return determined that the portion of the structure which had then been completed as of March 31, 1958, had a residual value as an eventual residence of $84,000 (this amount was subtracted from the amounts capitalized for the fiscal year which would become Kaynar's depreciable basis for Silvertop); that expenditures prior to June 30, 1957, had substantially gone into the residual value of the structure; that the depreciable benefits to Kaynar began approximately June 30, 1957; and consequently Silvertop was considered *162 to have a useful life as a research project beginning on June 30, 1957. Since Reiner expected the experimental and development aspects of the project to be completed by June 30, 1959, Silvertop was assigned a useful life of 24 months. Amortization or depreciation of the structure was claimed for 9/24th (there were nine months left in Kaynar's fiscal year which ended on March 31 of each year) of the estimated useful life of the structure. Deductions claimed in the partnership return of income for the period ended March 31, 1959, were determined in essentially the same manner in which deductions had been determined for the preceding year. In the latter year, in addition to the deduction as development expense of 80 percent of the architectural and engineering fees in the amount of $20,937.52, there was also deducted, as development expenses, the costs incurred at Inox, to the extent attributable to Silvertop, in the amount of $4,142.50. The $85,064.40 deduction for depreciation with respect to the structure was determined after increasing the residual value to $120,000 (which was subtracted from the amounts capitalized for the fiscal year which would be added to Kaynar's depreciable *163 basis for Silvertop) and extending the estimated useful life of the structure by one full year because Reiner expected that the research and development work would continue until June 30, 1960. Each year total deductions were subtracted from the other partnership income, and the remainder of the partnership taxable income or loss after such deduction was allocated equally between Klaus and Reiner. For the taxable years ended March 31, 1958, and March 31, 1959, Kaynar made the following expenditures on its Silvertop project: 4-1-57 to 3-31-58
4-1-58 to 3-31-59
Labor
$ 92,408.37
$ 55,416.64
Materials
43,535.68
37,574.48
Subcontractors and Rentals
63,570.20
39,663.77
Professional Services
T. Y. Lin
$ 7,921.50
John Lautner Architect
32,053.90
$26,171.90
Other - Engineering, etc.
6,599.15
4,620.19
46,574.55
30,792.09
Miscellaneous Expenses
Utilities, water, telephone
1,689.30
1,388.87
Real Estate Taxes
1,122.76
1,689.30
2,511.63
Inox
4,142.50
TOTAL
$247,778.10
$170,101.11
The deductions relative to the Silvertop project taken on Kaynar's partnership returns of income for *164 its years ended March 31, 1958, and March 31, 1959, resulted from the above expenditures being treated as follows: 3-31-58
3-31-59
EXPENDITURES
$247,778.10
$170,101.11
DEVELOPMENT EXPENSE
80% architectural and engineering fees
$31,980.32
$20,937.52
INOX
0
4,142.50
31,980.32
25,080.02
CAPITALIZED: current year
$215,797.78
$145,021.09
prior years
0
215,797.78
$360,818.87
Residual Value
84,000.00
120,000.00
Balance subject to amortization
$131,797.78
$240,818.87
Amortization claimed in previous years
0
49,424.17
Total amount subject to amortization
$131,797.78
$191,394.70
ESTIMATED REMAINING LIFE: End
6-30-59
6-30-60
Beginning
6-30-57
4- 1-58
Remaining Life
24 months
27 months
Fraction of Remaining Life in Taxable Year
9-24
12-27
Amortization claimed
$ 49,424.17
$ 85,064.40
Development expense
31,980.32
25,080.02
Total Deductions Claimed
$ 81,404.49
$110,144.42
Deductions for development expense in years subsequent to tax years here in issue followed the same pattern, except that the estimated useful life of the structure was increased *165 as it became apparent that the research and development work would continue longer than originally expected, and the residual value as a residence was increased to $150,000. On January 20, 1961, Reiner and Klaus entered into a written agreement under which Klaus sold his entire interest in the "Silvertop inventions" The $240,000 price was determined in accordance with their prior amended written agreement which contemplated that the partnership would expend a maximum of $600,000 at Silvertop; i.e., 80 percent of Klaus' ($300,000) partnership cost thereof. It was also agreed, inter alia, that Reiner would purchase the equipment of Inox at its book value; that Kaynar would sell to Kaynar, Inc., the dies and equipment pertaining to the hair clip purchase from Braga at its value on the books of Kaynar; that Reiner would purchase from Klaus all of Klaus' stock in the John Lautner Architect corporation at its cost to Klaus; and that Reiner would give to Kaynar his note in the amount he was overdrawn from Kaynar as of March 31, 1961, the note to bear interest at 6 percent with principal payments of a minimum of $5,000 a month, plus interest. Thereafter, on August 6, 1961, all the joint *166 activities between petitioners ceased and they divided the business of Kaynar and Kaynar, Inc., between themselves. The following are some of the features contained in Silvertop, which had not yet been furnished, at the time of the trial of this matter: 1. The main house contained three bedrooms, two full bathrooms and three half-bathrooms, a kitchen, a music room, and a 20- to 22-foot long dressing room off the master bedroom. 2. Approximately 6,000 square feet of enclosed floor space; approximately 4,000 in the main house which has a living roomdining room area of approximately 2,000 square feet. 3. A curved pre-stressed concrete roof that had the same design as the wooden roof which the original Lautner plans called for. 4. A large fireplace in the living room and another in the master bedroom. 5. A terrace off the master bedroom with a small patio beyond that. 6. The entire east wall of the living roomdining room area of the main house is glass from floor to ceiling, a portion of which is a motorized sliding glass door. 7. A part of the brick wall between the dining room and kitchen is motorized so that it can be raised by pushing a button. 8. A motorized, plexiglass *167 wall and ceiling in the bathroom off the master bedroom that can be opened or closed by pushing a button. 9. An area set aside in the basement of the main house for a room. 10. Two long tunnels under the main house so that new features can be incorporated into Silvertop without destroying the architecture. 11. A "central vacuum system." 12. A swimming pool, with one edge constituting a waterfall, windows in one side, and two outside showers in partial enclosures. 13. A tennis court. 14. A guest house (the roundhouse) which contains a living room, a kitchen, a bedroom, one and three-quarters bathrooms and a storage room. 15. Three separate water systems - tempered water, drinking water, and regular tap water. 16. An oversized sewer connection to help prevent possible stopping. 17. An oversized gas line. 18. Sink traps in the wall rather than under the sink. 19. Swepe, a push button control and security system that activates lights, gas torches in the patio area and motors to open and close doors and shutters. Opinion The basic issue for our decision is whether petitioners are entitled to deduct a portion of the cost of a personal residence as research and development *168 expenses and depreciation allowances under section 174 of the Internal Revenue Code of 1954. [2] The issue, as presented, is basically a factual one and turns on our evaluation of the voluminous record compiled during an eight-day trial. *169 Respondent, in his statutory notice, disallowed "development expenses" deductions claimed by Kaynar in its fiscal years ending March 31, 1958 and 1959, "because it has not been established that such expenses were incurred in the partnership trade or business or that they were ordinary, necessary or reasonable in amount." Petitioners strongly urge that the expenditures in question were not personal in nature; that they did not, nor were they ever intended to, redound to the personal advantage of any of the petitioners; and that they were bona fide business expenses. Petitioners contend that the construction of Silvertop, which concededly was intended to be Reiner's eventual home, served as a convenient means by which the partnership was able to carry on research and experimental activities in order to expand and diversify its business. Respondent's principal contention is that petitioners Reiner and Klaus caused an extremely expensive residence (Silvertop) to be constructed, which was designed to suit Reiner's personal taste in every respect, and which was intended for Reiner's personal use as a residence; that petitioners expended partnership funds for this purpose and, under *170 the pretense that these expenditures were connected with the partnership's (Kaynar's) business, they, as partners, attempted to obtain income tax deductions for what were purely personal expenses. Prior to the Revenue Act of 1954 there was no specific provision for the deduction of research and development expenses. Such expenses had to qualify under section 23(a)(1)(A) of the Internal Revenue Code of 1939, which was substantially the same as section 162(a), in order to be deductible. Section 162(a) provides that: There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * * The provisions of section 174 were first enacted into the revenue laws as part of the Internal Revenue Code of 1954. See S. Rept. 1622, 83d Cong., 2d Sess., 33, 214 (1954), where, at page 33, the purpose of the legislation is stated as "To eliminate uncertainty and to encourage taxpayers to carry on research and experimentation * * *." Section 174(a) authorizes the deduction of research or experimental expenditures which are paid or incurred by a taxpayer during the taxable year in connection with his trade *171 or business. [3]Section 174(c) excepts from this treatment any amounts expended for the acquisition or improvement of land, or for the acquisition or improvement of property to be used in connection with the research or experimentation which is subject to the allowance for depreciation under section 167 (relating to depreciation deductions for property used in a trade or business or held for the production of income). Section 174(c) does provide that depreciation allowances under section 167 shall be considered as expenditures under section 174. It is clear that Congress' intent in enacting this legislation was to provide taxpayers with the option of treating research and experimentation expenditures in much the same manner as ordinary and necessary business expenses deductible under section 162. *172 Congress did not define the phrase "trade or business" as it is used in section 174. However, it is made clear in committee reports relating to other Code sections which utilize the phrase, e.g., section 162, that the concept was not intended to include all activities engaged in for profit, but was used in the realistic and practical sense of a going trade or business. John F. Koons, 35 T.C. 1092, at page 1100 (1961). Whether a taxpayer's activities constitute the carrying on of a trade or business so that expenditures related to such activities may be currently deducted is basically a question of fact requiring an examination of the particular facts and circumstances in each case. See Higgins v. Commissioner, 312 U.S. 212 (1941). Two of the most recent cases that we have considered in this area are John F. Koons, supra, and Martin Mayrath, 41 T.C. 582 (1964), on appeal (C.A. 5, July 1, 1964). Koons purchased an undeveloped invention in the taxable year 1955 for $5,000 and paid a research laboratory $45,000 to perfect the invention into a patentable and commercial product. In 1958, letters patent on the invention were issued *173 to Koons. During the taxable year 1955 Koons' primary source of income was derived from an advertising agency in which he was an active partner. For a number of years preceding 1955, Koons had devoted a part of his time and efforts to investigating, promoting, and financing various enterprises which came to his attention through his advertising business. In holding that the $45,000 was not paid or incurred by Koons in connection with an existing trade or business and that he had not established that he was entitled to the benefits of section 174(a)(1), we stated at pages 1100-1101: It is our view that section 174(a)(1) applies to expenditures for research and experimentation in connection with an existing business to which such research and development is proximately related, such as the development or improvement of its existing products or services, or the development of new products and services in connection with such trade or business. We do not suggest that these generalities are all-inclusive. In the instant case, however, there was no such existing trade or business. The research and experimentation was no doubt in anticipation of the organizing of a business to make business *174 use of an end product when it reached the point of commercial acceptability. At the time the invention was bought by petitioners, however, it was in a preliminary laboratory state, and petitioner entered into the so-called Development Contract in part, at least, to get the benefit of research specialists. He went no further than this in 1955, however. It is our view that this activity was preliminary to the coming into existence of a business, and did not reach the stage of an existing business in the year in question within the meaning of section 174(a)(1). The research and development expenditures could not be "in connection with" a business which did not exist. It is clear that the statutory phrase "trade or business" presupposes an existing business with which the taxpayer is directly connected. Expenditures made in investigating a potential new trade or business, or preparatory to entering into such business, do not, in our opinion, qualify for the application of section 174(a)(1). The principle is recognized in our repeated disallowance of such expenditures. See Dwight A. Ward, 20 T.C. 332, 343 (1953), affirmed on another issue, 224 F. 2d 547 (C. *175 A. 9, 1955); George C. Westervelt, 8 T.C. 1248, 1254 (1947); Henry G. Owen, 23 T.C. 377, 381 (1954); Morton Frank, 20 T.C. 511, 513-514 (1953); Eugene H. Walet, Jr., 31 T.C. 461, 471 (1958), affd. 272 F. 2d 694 (C.A. 5, 1959). See also McDonald v. Commissioner, 323 U.S. 57 (1944). In Martin Mayrath, supra, petitioner Mayrath invented and patented several items relating directly or indirectly to farming. He then organized six corporations which engaged either in manufacturing, selling, or distributing those items. In 1956, Mayrath commenced the construction of a personal residence for himself. His primary concern was to assure that his personal design and ideas be carried out, and he worked closely with the contractor and made most of the decisions. The finished structure was a six-bedroom, five-bathroom house containing 5,826 square feet with a large carport attached. It had a tennis court, swimming pool and bath house. The home contained many innovations, some of which were not ordinarily found in residences and others which were normally found only in luxury residences. A few of the unusual *176 or luxury features contained in the house were: the use of glass, plastics, and aluminum instead of wood; two thermostatically-controlled, circulating hot water systems; hanging, heloidshaped, concrete stairway with aluminum and glass bannister; indirect lighting; three- and four-way light switches with dimmers; three-way switches on motor-operated drapes; kitchen cabinets suspended on vertical aluminum pipes; palm tree with an automatic warming coil in the planter; and a filtering system for the swimming pool. Mayrath encountered and solved several problems in the construction of the residence. He took no action while constructing the house, or immediately thereafter, to exploit any of his ideas. Three years after the house was completed, Mayrath mailed letters to seven metal and steel manufacturing companies trying to interest them in some of the "experimental features" of the house, but nothing came of the correspondence. In holding that Mayrath had failed to connect the construction of his residence with a trade or business, we stated, at pages 589-590, that: To a degree he is unquestionably an inventor, as evidenced by the various patents which he has obtained and for which *177 he has applied. With very few exceptions, however, these patents are directly or indirectly related to farming implements of one kind or another; and it is from these particular patents that petitioner has realized income either directly or through his corporations. Whether or not petitioner's work in connection with the invention and development of farming implements places him in the trade or business of inventing, we are completely unwilling to consider as a part of such trade or business his activities in building an "experimental" house for his own family's occupancy and in building factories, warehouses, and offices for the use of his wholly-owned corporations. Moreover, petitioner's actions during the construction of the house and following its completion do not bear out any intention to use the house or any of its features in the furtherance of a trade or business. Although we assume that in building a house containing no wood the petitioner mastered some of the construction problems involved, he has not shown that he intends to use such knowledge in the business of constructing residential homes or how he would do so if that were his intention. The only effort he made in *178 that direction was to send letters describing the house and some of its features to several metal manufacturers some 3 years after the house was completed and at about the same time petitioners' income tax returns for the years before us were being audited by the Internal Revenue Service. In John F. Koons, 35 T.C. 1092 (1961), we stated that the statutory phrase "trade or business" presupposes an existing business with which the taxpayer is directly connected and that expenditures for research and experimentation that are preliminary to the establishment of a business do not qualify as deductions under section 174. We think the statute was intended to be used in the realistic and practical sense of a going trade or business - a condition which does not exist here. Certainly the petitioner is not in the trade or business of constructing residences, and his attempt to relate such construction activities to other alleged trades or business is totally insufficient. and, at page 591, that: Even if we were to assume that it is petitioner's business merely to "invent," there is a point beyond which his propensity to experiment must be viewed as taking on the characteristics *179 of a hobby. At any rate, in the light of all these evidentiary facts and circumstances, we are not convinced that the cost of constructing petitioners' residence, unusual as it may be, is other than a personal living expense prohibited from deduction by section 262 of the 1954 Code. The instant case is easily distinguishable from John F. Koons, supra. Unlike Koons, Reiner and Klaus had engineering and inventing experience, in connection with their trade or business, for a number of years prior to the taxable years before us. Koons' expenditures in the development of a product and the acquisition of a patent were in no way connected with a trade or business. Respondent contends at great length that Kaynar was solely a sales organization and consequently that the research and development done at Silvertop was in no way proximately related to Kaynar's trade or business. We cannot agree with this position. Subsequent to their formation of the Kaynar partnership in 1943, petitioners invented and patented several items, in connection with the partnership's business, which they proceeded to manufacture and market through Kaynar with great commercial success. Although the *180 manufacturing operations were eventually transferred to Kaynar, Inc., a corporation formed by petitioners for this purpose, Kaynar retained responsibility for the sales and promotion activities relating to the manufactured products. In essence the partnership was, and remained, the parent organization while the corporation became the manufacturing division. Inox and John Lautner Architect, corporations formed by petitioners, also became divisions of Kaynar. It is petitioners' testimony that, with an eye to diversification, up to and during the taxable years before us, they never ceased in their efforts to find new products for Kaynar, Inc., to manufacture and Kaynar to exploit. It seems natural to us for a business organization to seek new products to manufacture and exploit; such was the stated intent of Congress in enacting section 174. See S. Rept. 1622, supra. It seems no less natural for a parent organization to seek new products for its manufacturing subsidiary. If Kaynar had paid an outside firm to do the research, there is no question that the amounts expended would be deductible under section 174. See section 1.174-2(a)(2), Income Tax Regs. We find *181 no basis for penalizing petitioners for undertaking their own research and development work. John F. Koons, supra, sets forth, and Martin Mayrath, supra, adopts the position that research and experimentation must be done in connection with and be proximately related to an existing business, such as the development or improvement of existing products or the development of new products and services in connection with such trade or business. Certainly we have before us an "existing business." Petitioners maintain, and we believe, that the research and development was done in connection with such business in order to develop new products. The facts of Mayrath are much closer to the factual evidence now before us than those in Koons. There, we held that the petitioner's activities in building an "experimental house" for his own family's occupancy, and in building factories, warehouses, and offices for the use of his wholly-owned corporations, were in no way related to his trade or business. Particularly convincing were the facts that Mayrath moved in immediately after the completion of construction and made no effort to exploit any of his ideas until the Internal *182 Revenue Service began to audit his income tax returns some three years later. At the time of trial, Silvertop had not yet been furnished or occupied and had been utilized, on several occasions, to show the developments that were being experimented with to interested members of the public. We do not feel it necessary to repeat our lengthy findings of fact at this juncture. Suffice it to say that our analysis of the facts convinces us that the nature and continuous pattern of petitioners' activities at Silvertop were in connection with and proximately related to their and Kaynar's trade or business. In Mayrath we found that petitioners' expenditures were not of a research and experimental nature within the intendment of section 174. We also expressed our doubt as to the "experimental" nature of the house and the items it contained. Here we have no doubt that some of the projects at Silvertop were of a research and experimental nature within the intendment of section 174. However, we are equally convinced that much of the efforts at Silvertop resulted in merely customization to suit Reiner's particular tastes. [4] In particular, we refer to the mechanization of many of the structural *183 components of the house. Motorized windows, curtain rods, walls and ceilings (which were the subject of much work and expense at Silvertop) are not unusual and were not unusual during the years before us. Indirect and mechanically and electrically adjustable lighting have been with us for many years. Separate water systems, over-sized sewage drains, unusually large supplies of electric power, and pools with waterfalls are distinguished only by their costliness, not by any research and developmental nature. Features such as we have just mentioned highlight the incongruity of petitioners' contention that all of the activities at Silvertop were of a research and developmental nature. As we stated in Mayrath, at pages 590-591: It may be true that, in petitioner's mind, some of the ideas were new, unique, or involved special problems. But the record as a whole reveals that many of the so-called "experimental" features were either catalog or luxury items and that the special problems encountered were often the result of unusual combinations of materials, modifications of standard construction principles, or the utilization in residential construction of certain features commonly used in *184 commercial construction. Respondent attributes great pertinence to the fact that, prior to Kaynar's sale of the pin curl clip patent to Kaynar, Inc., for $950,000, Reiner transferred the same patent to Kaynar for the consideration of one dollar. However, since we have found that Reiner did his investigating and inventing under the auspices of Kaynar, and since patents can only be issued to an individual, we do not find it strange that Reiner obtained the patents in his own name and then transferred them to Kaynar. Respondent also makes much of the close interrelationship between petitioners and their wholly-owned business entities. He stresses the difficulty of determining who did and owned what, and when, as between petitioners and their wholly-owned business organizations. It is true that petitioners operated almost entirely under an oral partnership agreement for many years because of the trust and confidence they had in each other. It is also true that it has been difficult *185 to delineate clear lines of activity and responsibility between petitioners, Kaynar, Kaynar, Inc., John Lautner Architect, and Inox. However, we have not found this difficulty to be insurmountable or determinative of any of the parties' contentions. Respondent's argument consists mainly of peripheral arguments such as this and we do not find it convincing. We have found no reason to disbelieve the essential elements of the testimony by petitioners and their witnesses. The manner in which Kaynar's books represented the expenditures at Silvertop presents a serious problem in this case. We have no information before us that would allow us to allocate costs among the numberless projects that petitioners claim were going on at Silvertop. Petitioners' contention that 80 percent of the non-capital expenditures at Silvertop were allocable to research and experimentation and that, since 100 percent of the capital expenditures at Silvertop, in excess of the assigned residual value as a personal residence, were for property used in connection with research and experimentation and subject to depreciation under section 167, all depreciation allowances claimed were allocable to research and experimentation, *186 lacks the identification of specifics. We are convinced that Silvertop's ultimate value as a personal residence will be (if it has not already been occupied) substantially in excess of the $150,000 ultimately contended for by petitioners. [5] As we have already set forth, we are convinced that some of the activities at Silvertop were of a research and experimental nature within the intendment of section 174 and some were not. Substantially assisted by the very able presentation of the evidence by counsel for petitioners, and after a long and careful examination of the voluminous record and briefs before us, and with full consideration of the arguments of law presented, we hold that 35 percent of the expenditures at Silvertop and 35 percent of the depreciation allowances claimed *187 as research and development expenditures, with respect to Silvertop, over and above the claimed residual value of $150,000 as a residence, are allowable as deductions under section 174. Cohan v. Commissioner, 39 F. 2d 540, 544 (C.A. 2, 1930). Since we have held for petitioners on the law, we do not find it necessary to consider their alternative contention. Several other issues were raised by respondent and petitioner Klaus subsequent to the notice of deficiency and all the pleadings thereunder and are not properly before us. While not deciding any of these issues, we note in passing that none of them appear to have real substance. Decisions will be entered under Rule 50. Footnotes
1. The entire written agreement (Exhibit 5) is included herein by this reference.↩
2. All references herein are to the Internal Revenue Code of 1954 unless otherwise indicated. SEC. 174. RESEARCH AND EXPERIMENTAL EXPENDITURES. (a) Treatment as Expenses. - (1) In general. - A taxpayer may treat research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to capital account. The expenditures so treated shall be allowed as a deduction. * * *
(c) Land and Other Property. - This section shall not apply to any expenditure for the acquisition or improvement of land, or for the acquisition or improvement of property to be used in connection with the research or experimentation and of a character which is subject to the allowance under section 167 (relating to allowance for depreciation, etc.) or section 611 (relating to allowance for depletion); but for purposes of this section allowances under section 167, and allowances under section 611, shall be considered as expenditures.↩
3. Section 1.174, Income Tax Regs., provides, in so far as applicable hereto, as follows: § 1.174-2 Definition of research and experimental expenditures. (a) In general. (1) The term "research or experimental expenditures", as used in section 174↩, means expenditures incurred in connection with the taxpayer's trade or business which represent research and development costs in the experimental or laboratory sense. The term includes generally all such costs incident to the development of an experimental or pilot model, a plant process, a product, a formula, an invention, or similar property, and the improvement of already existing property of the type mentioned. The term does not include expenditures such as those for the ordinary testing or inspection of materials or products for quality control or those for efficiency surveys, management studies, consumer surveys, advertising, or promotions. However, the term includes the costs of obtaining a patent, such as attorneys' fees expended in making and perfecting a patent application. * * *
4. At the suggestion of counsel for the parties, the Court visited Silvertop on Saturday, October 26, 1963, in the company of counsel for the parties and spent some two hours viewing the property.↩
5. This should not be construed, however, as an acceptance by us of petitioners' theory that the proper method of determining research and experimental expenditures is to subtract from total expenditures those items which are clearly nondeductible and/or personal in nature, or are allocable to residual residential value rather than affirmatively proving what expenditures, if any, qualify under section 174↩.